**UNTIED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MIDFIELD CONCESSION
ENTERPRISES, INC.,

                Plaintiff,                      CASE NO. 2:14-cv-12174

v.                                      HON. MARIANNE O. BATTANI

AREAS USA, INC., et al.,

                Defendants.

and

AREAS USA, INC.,

                Defendant/Counter-Plaintiff,

v.

MIDFIELD CONCESSION
ENTERPRISES, INC.,

                Plaintiff/Counter-Defendant,

and

SAMIR W. MASHNI,

                Counter-Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF MIDFIELD'S PARTIAL MOTION FOR SUMMARY JUDGMENT (Doc. 46), GRANTING IN PART AND DENYING IN PART DEFENDANTS AREAS USA AND AREAS MCNAMARA'S PARTIAL MOTION FOR SUMMARY JUDGMENT (Doc. 38), AND GRANTING COUNTER-DEFENDANT SAMIR MASHNI'S MOTION FOR SUMMARY JUDGMENT (Doc. 40)**

**I.      INTRODUCTION**

This matter is before the Court on three separate motions for summary judgment: (i) Plaintiff Midfield Concession Enterprises, Inc.'s Motion for Partial Summary Judgment (Doc. 46); (ii) Defendants Areas USA, Inc., and Areas McNamara JV, LLC's (collectively, "Areas") Motion for Partial Summary Judgment (Doc. 38); and (iii) Counter Defendant Samir Mashni's Motion for Summary Judgment (Doc. 40).

The present action stems from a joint venture agreement between Plaintiff Midfield and Defendant Areas USA. Midfield alleges that Areas USA violated the Covenant Not to Compete found in this joint venture agreement and seeks judgment as a matter of law for the claims of Breach of Contract (Count I) and Breach of Fiduciary Duty (Count IV) found in its First Amended Complaint. (Doc. 25). In its Motion for Partial Summary Judgment, Midfield also seeks the following three declaratory judgments concerning Counts I through III of Areas USA's Amended Counterclaim (Doc. 30): that Midfield did *not* waive the applicability of the Covenant Not to Compete (Count I); that Midfield did *not* commit an anticipatory breach of contract (Count II); and that Midfield is entitled to summary judgment dismissing Areas USA's interference with business relations claim (Count III). (Doc. 46). Counter-Defendant Samir Mashni, Midfield's Vice-President and General Counsel, joins Midfield in his Motion for Summary Judgment seeking a declaratory judgment dismissing Areas USA's interference with business relations claim (Count III). (Doc. 40).

Areas USA maintains in its Amended Counterclaim and here seeks summary judgment that the Covenant Not to Compete is unenforceable because Midfield and Areas USA have waived its applicability through prior course of performance and, in the alternative, because it is an unreasonable restraint on trade (Count I). (Doc. 30). In

their Motion for Partial Summary Judgment, Defendants further seek dismissal of: Midfield's misappropriation of trade secrets claim (Count II); Midfield's breach of contract for failure to pay capital costs claim (Count III); Midfield's unjust enrichment claim against Areas USA (Count V); and Midfield's unjust enrichment claim against Areas McNamara (Count VI).  (Doc. 38).

For the following reasons, this Court **GRANTS IN PART AND DENIES IN PART** Plaintiff Midfield's Partial Motion for Summary Judgment, **GRANTS IN PART AND DENIES IN PART** Defendants Areas USA and Areas McNamara's Partial Motion for Summary Judgment, and **GRANTS** Counter Defendant Samir Mashni's Motion for Summary Judgment.

## II.    STATEMENT OF FACTS

Midfield Concessions Enterprises, Inc., ("Midfield") is a Michigan corporation in the business of establishing, managing and operating food and beverage concessions at various airports throughout the country.  (Pl.'s First Am. Compl. ¶¶ 1, 5, Doc. 25).  In particular, Midfield has operated food concessions at the Detroit Metropolitan Airport ("DTW"), including the "Mediterranean Grill" Restaurant in the South/McNamara Terminal, since 2002.  (Id. at ¶ 9).  Areas USA, Inc., is a Florida corporation that provides food, beverage and retail services in the U.S. travel and hospitality industries.  (Id. at ¶¶ 2, 6).  Representatives from Midfield and Areas USA began discussions sometime in 2006 or 2007 about forming a joint venture.  (Pl.'s Mot. for Partial Summ. J. 3, Doc. 46).  These discussions culminated in the execution of the Amended Joint Venture Agreement ("JV Agreement"), (Doc. 46, Ex. A), on June 28, 2007, that created the Joint Venture entitled AREAS MCE Detroit, JV. (Doc. 25, ¶ 8).

3

### A.  The Amended Joint Venture Agreement & Covenant Not to Compete

The purpose of the Joint Venture, as stated in § 1.6 of the JV Agreement, was to "operate a food concession or concessions at the Detroit Metropolitan Wayne County Airport ("Airport") at Detroit, Michigan, New North Terminal . . . ."  (Doc. 46, Ex. A at 1). In order to protect its interests in pre-existing concessions at the McNamara Terminal, including the Mediterranean Grill Restaurant, Midfield insisted upon including a Covenant Not to Compete in the JV Agreement that applied to both the McNamara and North Terminals.  (Mashni Dep., 51:19–52:2, Nov. 6, 2014, Doc. 46, Ex. C).  The Covenant Not to Compete reads:

> AREAS USA and MIDFIELD CONCESSION ENTERPRISES, INC. hereby agree not to compete for any food and beverage concessions at the Detroit Metropolitan Airport throughout the term of this Agreement. Either AREAS USA or MIDFIELD CONCESSION ENTERPRISES, INC., can, however, submit proposals to the Detroit Metropolitan Airport on their own if the other party does not wish to pursue said business opportunity at Detroit Metropolitan Airport.

(Doc. 46, Ex. A at 15).  The process of acquiring a concession begins when the DTW Airport Authority requests proposals from qualified concessionaires, such as Midfield or Areas USA, to operate available concessions.  (Mashni Decl., ¶ 3, Doc. 46, Ex. B).  The Airport Authority holds various informational "Outreach Meetings" attended by concessionaires who may or may not opt to bid.  (Id. at ¶ 11).  After interested concessionaires submit their proposals, or bids, the Airport Authority evaluates and awards the concession to the highest ranked bid.  (Id. at ¶¶ 4-5).

### B.  Areas' Alleged Breach of the Covenant Not to Compete: The McNamara Terminal Bids & Mediterranean Grill

Midfield originally acquired the McNamara Terminal's Mediterranean Grill concession in 2002.  (Doc. 46 at 4).  Airport concessions are typically awarded for a

4

period of ten years, and it became known that the DTW Airport Authority would be requesting new proposals for the McNamara Terminal concessions ("McNamara RFP") in the summer of 2013.  (Id.).  The McNamara RFP was broken down into eight packages for bidding, with the Mediterranean Grill being Package #6.  (Id. at 5).

In either the fall or winter of 2012 at the Denver Airport, Samir Mashni, representing Midfield, discussed with Eduardo Uribe, Vice-President of Business Development at Areas USA, concerning the upcoming McNamara RFP.  (Mashni Dep. 64:6-24).  Uribe neither confirms nor denies that this conversation occurred, claiming that he does not recall whether or not it took place.  (Uribe Dep. 72:6-21, Nov. 21, 2014, Doc. 46, Ex. D).  Specifically, Mashni testified that he informed Uribe that Midfield would be bidding to protect its current interests in the McNamara Terminal and inquired as to Areas USA's bidding intentions.  (Mashni Dep. 64:6-24).  According to Mashni, Uribe said that Areas USA was unsure about whether it would bid.  (Id.).  Although Mashni told Uribe to notify him when Areas USA's position was clear (id. at 76:14-16), Mashni never heard back from anyone at Areas USA (id. at 74:10-14).  Midfield inferred from Areas USA's silence that it would not be bidding for the Mediterranean Grill or any of Midfield's current interests.  (Id. at 74:15-24).  Midfield submitted bids for multiple packages, including Package #6 for Mediterranean Grill, on December 4, 2013. (Mashni Decl., ¶ 16).

In fact, Areas USA formed Defendant Areas McNamara JV, LLC, "a month or so or a couple of months before the RFP was due" for bidding in the McNamara RFP. (Uribe Dep. 92:4-9; 98:7-10).  Areas USA never disclosed the existence of Areas McNamara to Midfield.  (Id. at 108:17-21).  Areas McNamara bid on and was awarded

5

Package #6 in 2014.  (Mashni Decl. ¶ 19).  According to Uribe, Areas USA did not believe the Covenant Not to Compete was applicable at the time of the McNamara RFP, stating, "When time passed, we completely forgot about this covenant . . . [w]e didn't have a relationship with Midfield."  (Uribe Dep. 42:5-14).  Primarily because of disputes between the parties concerning capital contributions, Uribe testified that "[t]he relationship was really bad for many years . . . at some point really the companies were completely running independently.  It's like, you know, we weren't partners anymore."  (Id. at 35:1-17).  Mashni counters that the relationship and validity of the Covenant Not to Compete between Midfield and Areas USA was still ongoing at this point, despite any prior disagreements.  (Mashni Dep. 81:5-22).

Of the eight concessionaires that bid on Package #6, Areas McNamara won it, with an evaluation score of 439 out of 500; Midfield scored second highest with a score of 414.  (Doc. 46, Ex. G at 168).  If Areas USA had not bid on Package #6, therefore, it would have been awarded to Midfield.  Consequently, Midfield asserts that Areas USA's alleged breach of the Covenant Not to Compete deprived Midfield of 10-13 years of future revenue that would have been generated by the Mediterranean Grill, estimated to be in excess of $7,000,000.00.  (Doc. 25, ¶ 26).

I.      STANDARD OF REVIEW

Summary judgment is only appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law in each case will determine which facts are material,

as "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment always bears the initial burden of informing the court of the basis for its motion using the entire record available. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In response, the opposing party must present more than a "mere scintilla" of evidence supporting its claim. Anderson, 477 U.S. at 252. If this record could not lead a rational trier of fact to find for the opposing party, then there is no genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). All evidence provided by the non-moving party is to be believed, and all justifiable inferences from this evidence are to be drawn in favor of the non-moving party. Anderson, 477 U.S. at 255.

## II.    DISCUSSION

### A. Breach of the Covenant Not to Compete

In addressing the parties' multiple and complex arguments regarding Areas' alleged breach of the Covenant Not to Compete, the Court first examines whether Midfield establishes a breach and then turns to Areas' various defenses. When interpreting the terms of a written contract, the Court is obligated to ascertain the intent of the contracting parties. Quality Prods. & Concepts Co. v. Nagel Precision, Inc., 469 Mich. 362, 375 (2003). The Court will construe and enforce the contract as written so long as the contractual language is clear and unambiguous. Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel, 460 Mich. 558, 570 (1999). Thus, as a matter of law, unambiguous contractual provisions are reflective of the parties' intent and will be enforced unless

7

contrary to public policy. <u>Quality Prods.</u>, 469 Mich. at 375. Stated plainly, unambiguous contracts are not open to judicial construction. <u>Rory v. Cont'l Ins. Co.</u>, 473 Mich. 457, 468 (2005). Courts cannot perfect contracts that the parties themselves have left imperfect, but may only interpret contracts as made. <u>Stevens v. Huffmaster Crisis Response, LLPC</u>, No. 249486, 2004 WL 2726033, at *1 (Mich. Ct. App. Nov. 30, 2004).

In order to successfully assert a breach of contract claim, the party seeking recovery must first establish the elements of a valid contract. <u>Pawlak v. Redox Corp.</u>, 182 Mich. App. 758, 765 (1990). Afterwards, the party "'must then prove by a preponderance of the evidence the terms of the contract, that the defendant breached the terms of the contract, and that the breached [sic] caused the [party's] injury.'" <u>Slomka v. Hamtramck Hous. Comm'n</u>, No. 298025, 2012 WL 4800421 at *3 (Mich. Ct. App. Oct. 9, 2012) (quoting <u>In re Brown</u>, 342 F.3d 620, 628 (6th Cir. 2003)). Here, there is no disagreement between the parties that the JV Agreement and Covenant Not to Compete meet the requirements of a valid contract. Consequently, Midfield's remaining burden is to prove the following three elements by a preponderance of the evidence: (i) the terms of the Covenant Not to Compete; (ii) that Areas breached the terms of the Covenant; and (iii) that Areas' breach caused Midfield's injury. <u>See</u> <u>id.</u>

Concerning element (i), Midfield succeeds in proving that the terms of the Covenant Not to Compete forbade Areas USA from bidding on the Mediterranean Grill in DTW's McNamara Terminal. The Covenant unambiguously mandates that Midfield and Areas USA "agree not to compete for any food and beverage concessions at the Detroit Metropolitan Airport throughout the term of this Agreement." (Doc. 46, Ex. A at 15). As a matter of law, this Court concludes that the Mediterranean Grill qualifies as a

"food and beverage concession," that the McNamara Terminal is covered as part of the "Detroit Metropolitan Airport," and that bidding against the other party for a concession constitutes "competing." The parties do not dispute, either in their briefs or at oral argument, that the Covenant Not to Compete applies to the entire airport even though the Joint Venture itself is limited to the North Terminal.

In essence, the Covenant Not to Compete prevents the parties from bidding against one another for a concession opportunity not pursued by the Joint Venture. This conclusion is bolstered by the testimony of both parties' representatives. Eduardo Uribe, Vice-President of Business Development at Areas USA, unequivocally testified that "[b]idding for the same concession [as a joint venture partner] is competing." (Uribe Dep. 41:8-11). Likewise, according to Mashni, if both Areas and Midfield wished to bid on the same concession individually and independently of the Joint Venture, they would have to reach an agreement as to which party could bid. (Mashni Dep. 49:11-15, 65:16-22). In the event that an agreement could not be reached, it is Mashni's interpretation of the Covenant that neither Midfield nor Areas USA would be allowed to bid. (Id. at 69:10-21).

With respect to element (ii), Midfield also proves by a preponderance of the evidence that Areas breached the terms of the Covenant Not to Compete by bidding on the Mediterranean Grill, a concession owned and operated by Midfield for over ten years. There is no question of fact that Areas was aware of Midfield's intent to bid on the Mediterranean Grill because Areas USA representatives admittedly presumed that Midfield would bid on that concession. (Rabell Dep. 67:1-12, Mar. 13, 2015, Doc. 46, Ex. F). Areas has presented no compelling evidence that it was unaware of Midfield's

9

intentions, apart from Uribe's ambiguous statement that he simply does not recall whether he and Mashni had a conversation regarding Midfield's intentions to bid on the Mediterranean Grill.  (See Uribe Dep. 72:6-21).  This statement is insufficient to overcome the evidence supporting Midfield's claim.  Mashni testified that either party, upon learning of the other's intent to bid, must notify the other within a "reasonable time" if it also intends to bid.  (Id. at 75:21–76:13).  He defines a "reasonable time" as "[a] month, or two, or three months.  Before the [bid] preparation took place." (Id.).  Although there is no explicit timely notice requirement in the Covenant Not to Compete, it is reasonable to conclude that, upon learning of Midfield's intent to bid on the Mediterranean Grill, Areas USA's subsequent formation of Areas McNamara and its bid amounted to a knowing violation of the Covenant.

Finally, Midfield also establishes element (iii) by a preponderance of the evidence.  The injury resulting from Areas' breach is the loss of the Mediterranean Grill concession and the ten to thirteen years of future revenue that Midfield estimates to be in excess of $7,000,000.00.  (Doc. 25 at ¶ 26).  Of the eight concessionaires that bid on the Mediterranean Grill, Areas McNamara won with an evaluation score of 439 out of 500; Midfield scored second highest with a score of 414.  (Doc. 46, Ex. G at 168).  If Areas had not bid on the Mediterranean Grill it would have been awarded to Midfield.  Thus, Midfield has sufficiently demonstrated a causal link between Areas' breach and Midfield's injury.  Further, Midfield has proven the elements of a successful breach of contract claim.

### a. Waiver By Failure to Object

In Count I of Areas' Amended Counterclaim (Doc. 30), it seeks a declaratory judgment regarding the first of its defenses against the breach of contract claim – that even if it breached the terms of the JV Agreement, Midfield waived its right to object when it failed to do so within a reasonable time after learning of Areas' breach.  The concept of waiver of breach is described succinctly by the Supreme Court of Michigan in Schnepf v. Thomas L. McNamara, Inc., 354 Mich. 393, 397 (1958):

> Where there has been a material breach which does not indicate an intention to repudiate the remainder of the contract, the injured party has a genuine election either of continuing performance or of ceasing to perform.  Any act indicating an intent to continue will operate as a conclusive election, *not indeed of depriving him of a right of action for the breach which has already taken place*, but depriving him of any excuse for ceasing performance on his own part.   (Italics supplied).

Waiver of a breach of contract by the non-breaching party may be evidenced by express language, declarations, acts, or conduct inconsistent with a purpose to exact strict performance from the breaching party.  Grand Rapids Asphalt Paving Co. v. City of Wyoming, 29 Mich. App. 474, 483 (1971).  This form of waiver is essentially a choice by the non-breaching party to overlook another party's deficiency in performance and necessarily implies knowledge of the deficiency that is waived.  5A Mich. Civ. Jur. Contracts § 197.  In order to prove that Midfield waived its right to object, Areas must show both of the following: (i) that Midfield was aware of Areas' breach and (ii) that Midfield chose, as demonstrated by it words or actions, to overlook this breach.  Grand Rapids Asphalt Paving Co., 29 Mich. App. at 483.  Areas must establish these criteria by "clear and convincing" evidence, a heightened standard compared to preponderance of the evidence.  Quality Prods., 469 Mich. at 364.

11

Beginning with element (i), Midfield's awareness of Areas' breach can only be proven if it is shown that Midfield was aware, before the bidding deadline, of Areas McNamara's bid on the Mediterranean Grill.  While it is clear that Areas was aware of Midfield's intention to bid at the McNamara RFP, there is stated disagreement over whether Midfield knew that Areas would bid.  Mashni testifies that Midfield first learned of Areas' intent to bid when he became aware on or about February 11, 2014, that an unfamiliar entity called Areas McNamara JV, LLC, bid on Package #6, this being more than two months after the bidding deadline had passed.  (Mashni Decl., ¶ 18).  Uribe, on the other hand, testified, "I'm a hundred percent sure they knew we were bidding." (Uribe Dep. 51:5-9).  To support this assertion, Uribe points to both Areas USA's words and actions.

First, Areas seeks to enter into evidence Uribe's deposition testimony stating that Rick Stout, Areas USA's General Manager at the time, told Uribe that he had informed Midfield's general managers of Areas' intention to bid on all concession opportunities. (Id. at 51:12-52:24 ("Well, he was always saying that we were going to bid.  We were going to go after everything [at the McNamara RFP].  We're going to bid for everything.  He told that to the airport.  He was very vocal about it.")).  Mashni testified that he is unaware of any conversation between Stout and himself or any other Midfield representative.  (Mashni Dep. 90:23–91:8).  Uribe also does not remember ever telling Mashni personally that Areas USA intended to bid at the McNamara RFP.  (Uribe Dep. 45:52–46:3).  Therefore, if Uribe's testimony concerning Stout's statements is to be considered, there is at most a question of fact regarding Midfield's notice of Areas' intent to bid.

12

Midfield argues, however, that Stout's statements are inadmissible as hearsay evidence that may not be considered at summary judgment. See Back v. Nestle USA, Inc., 694 F.3d 571, 580 (6th Cir. 2012). Because Areas seeks to rely upon Uribe's out of court statement concerning an out of court statement made by Stout, this testimony is properly classified as double or "layered" hearsay. In accordance with Fed. R. Evid. 805, "[f]or double-hearsay statements to be admissible, each separate statement must either be excluded from the hearsay definition or fall within a hearsay exception." Id. at 578. Here, Areas argues that Stout's statement falls within the hearsay exception set forth by Fed. R. Evid. 803(3) as a declarant's statement of intent. Irrespective of whether Stout's statement falls within this hearsay exception, however, Uribe's statement does not. Nor does Uribe's statement classify as nonhearsay within the parameters of Fed. R. Evid. 801(d)(2)(D) for statements made by the party's agent or employee on a matter within the scope of that relationship, as Uribe's testimony is not being offered by an opposing party against Areas' interests but rather by Areas in favor of its own interests. Areas offers no further argument regarding the admissibility of Uribe's testimony on this matter. Therefore, this testimony is inadmissible hearsay, and, consequently, it may not be used to create a question of fact.

Second, Uribe testified that Areas USA announced its intention to bid by its actions. (Uribe Dep., 111:24–112:4). For example, Areas points to the fact that Mashni saw Areas USA representatives at an Outreach Meeting for the McNamara RFP on July 31, 2013, as evidence that Midfield knew Areas intended to bid on the Mediterranean Grill. (Mashni Dep. 86:15–87:5). The problem with this argument is twofold. First, attendance at an Outreach Meeting does not always result in bid submissions. (Mashni

Decl. ¶¶ 12-15 ("Typically, only a fraction of the entities whose representatives attend an outreach meeting submit a proposal.")).  Even Xavier Rabell, CEO of Areas USA, concedes that attendance at an Outreach Meeting is no guarantee of a future bid:

> Q.    Areas USA and its affiliates don't bid on every package that's
>        presented at those meetings, does it?
> A.     Correct.
> Q.    Sometimes Areas USA will go to informational meetings or
>        outreach meetings and not bid at all on the package, correct?
> A.     Correct.  It's common in the industry, yes.

(Rabell Dep. 68:14-21).  Second, the DTW Airport Authority requested proposals for multiple packages during the McNamara RFP, not only for the Mediterranean Grill in Package #6.  Thus, even if Areas USA's presence at the Outreach Meeting signaled to Midfield that Areas intended to bid, this is only indicative of a *general intent* to bid at the McNamara RFP as opposed to a *specific intent* to bid on the Mediterranean Grill.  It is a distinct possibility that Areas USA meant to bid solely on concessions other than the Mediterranean Grill. Consequently, Areas USA's mere presence at the Outreach Meetings was insufficient to put Midfield on notice that Areas would be bidding on Mediterranean Grill.  Separately, Uribe testified that Mashni saw representatives from Areas USA practicing one of their bid presentations for the DTW Airport Authority; however, this occurred after the bids were submitted and does not speak to whether Midfield knew of Areas' intent before the fact.  (See Uribe Dep. 54:6–55:8).

In response to the argument that Areas USA's presence at the meeting did not establish a clear intent to bid, Areas cites Mashni's following testimony as dispositive proof that Midfield knew Areas USA meant to bid: "Q. Did you ever come to learn why Ms. Ellison [of Areas USA] was at the [outreach] meeting?  A. Yeah. They obviously meant to bid."  (See Mashni Dep. 88:8-10).  This testimony, however, is taken out of

14

context.  It is clear from the full deposition transcript that Mashni's response was made with the benefit of hindsight; it was not obvious to Mashni at the time of the Outreach Meeting that Areas meant to bid.  Separately, Areas USA cites the following excerpt from Mashni's deposition as confirmation that Midfield was aware of Areas' intent to bid: "Q. Would [Areas USA's] presence at the outreach normally signal to you that they might be interested in bidding?  A. Yes." (Mashni Dep. 56:4-6).  Again, Mashni's testimony is being misapprehended.  All that may be accurately gleaned from this snippet of testimony is that Areas USA's presence indicated that they *might have* bid, not that they *would* bid.  Ultimately, Areas USA fails to prove that its actions clearly and unmistakably put Midfield on notice.

Because Areas USA fails to satisfy element (i) required for a successful assertion of waiver, discussion of element (ii) becomes moot.  Quite simply, if Midfield was not actually aware of Areas USA's breach, then it could not have chosen to overlook that breach.  Still, Areas USA does make one final argument that Midfield waived its right to object.  It is undisputed that Mashni did, in fact, become aware of Areas McNamara's bid prior to learning that Areas was awarded the bid; however, he did not make this discovery until after the bidding deadline had passed.  (Mashni Dep. 119:13-15).  It was only after Areas McNamara won the Mediterranean Grill that Midfield brought suit for breach of contract.  Areas USA argues that this delay amounts to a waiver of the breach.  This assertion is incorrect for two reasons.  First, Midfield was still well within Michigan's six-year statute of limitations for breach of contract claims.  See Mich. Comp. Laws Ann. § 600.5807.  Second, Mashni reasonably explains that the reason Midfield

delayed bringing suit was that, prior to Areas McNamara actually being awarded the bid, Midfield had no damages upon which to sue.  (Mashni Dep. 119:16-25).

In conclusion, Areas has failed to show by clear and convincing evidence that Midfield waived its right to object to the breach. Therefore, this Court finds that Midfield is entitled to summary judgment on Count I of Areas' Amended Counterclaim.

### b.  Waiver By Modification and Course of Performance

In its briefs, Areas seeks in the alternative to avoid liability for breach of the Covenant Not to Compete by arguing that there is question of material fact as to whether Midfield actually waived the operation of the Covenant.  If not unilaterally, Areas also argues there is a possibility that both Areas USA and Midfield have, through prior course of performance, mutually modified the JV Agreement by abandoning the Covenant Not to Compete.  Midfield is adamant that the Covenant Not to Compete remained effective at the time of the McNamara bids.

Waiver of a contractual provision, a similar but distinct concept from waiver of breach, requires that there be an "intentional and voluntary relinquishment of a known right."  Roberts v. Mecosta County Gen. Hosp., 466 Mich. 57, 69 (2002).  The party seeking to prove waiver bears the burden of showing by clear and convincing evidence that the opposing party intended to waive the contractual provision.  Design Basics, LLC, 977 F. Supp. 2d at 735.  However, a party cannot *unilaterally* alter an existing bilateral agreement.  Quality Prods., 469 Mich. at 372.  Rather, a party alleging waiver or modification must establish a mutual intention of the parties to waive or modify the original contract.  Id.  This mutual intent can be established through clear and convincing evidence of a written agreement, oral agreement, affirmative conduct, or the

16

parties' prior course of conduct.  Id. at 373.  Whether the parties agreed to modify the contract can be deduced from their prior course of conduct if it is unequivocal and the terms of modification are definite, certain, and intentional.  Diponio Contr. v. City of Howell, 2015 Mich. App. LEXIS 706 at *19 (Mich. Ct. App. Apr. 14, 2015).  Although a party's prior course of conduct may serve as evidence of waiver, this alone is insufficient to establish contractual waiver absent indisputable evidence that the party intended to relinquish its rights by such conduct.  Quality Prods., 469 Mich. at 374.

Areas points to instances where Midfield bid on concessions unilaterally as evidence that it abandoned the Covenant Not to Compete, the first being the "chicken concept."  When the relationship between Midfield and Areas USA was still "relatively new" (Mashni Dep. 58:20-23), Midfield unilaterally pursued an opportunity to bid on a fried chicken concept at DTW's McNamara Terminal, (id. at 47:12–48:17).  Because it was not located in the North Terminal, bidding on this particular concession was not subject to the Joint Venture; however, it was still covered by the Covenant Not to Compete.  Areas USA argues that Midfield never informed Areas about its intent to bid on the chicken concept.  Mashni testified that he is sure he had some conversation with Uribe about pursuing the chicken concept but that he does not remember the extent of the conversation.  (Id. at 48:18–49:2).  When specifically asked whether he communicated with Areas USA about potential interest in pursuing the chicken concept, Mashni answered, "I'm sure I did. I just don't recall when."  (Id. at 51:9-13).  Nor does Mashni recall Areas USA explicitly telling him that it was or was not interested in bidding on the chicken concept.  (Id. at 55:10-13).  Areas USA apparently interprets Mashni's statements to mean that no discussion ever took place between Areas and Midfield;

17

however, Mashni clearly testified that he is sure he spoke with Areas about the chicken concept.  Further, Areas cites to no deposition testimony or other evidence directly contradicting Mashni's claims that a discussion took place.  Accordingly, the Court declines to find Areas' allegations regarding the chicken concept to be compelling evidence of Midfield's waiver of the Covenant Not to Compete.

Areas next contends that, at the 2012 meeting in Denver between Uribe and Mashni, Mashni did not explicitly inform Uribe that Midfield would be bidding on the Mediterranean Grill in particular.  Instead, Mashni testified as follows: "Q. Did you tell [Uribe] you were going to bid on everything, or just some particular things?  A. Well, no, I think – no, I said protect our interests, our properties."  (Mashni Dep. 73:11-15).  Consequently, Areas USA argues that Midfield never informed it of its intent to bid on the Mediterranean Grill, thus abandoning the Covenant Not to Compete.  This argument has little merit.  Areas USA had been Midfield's Joint Venture partner for a period of at least five years at that point, knew that Midfield had been operating the Mediterranean Grill since 2002, and surely could have drawn the basic conclusion that when Mashni referred to Midfield's "interests and properties," he was indeed referencing the Mediterranean Grill.  Additionally, as previously noted, Areas' position is belied by its CEO's testimony that Areas presumed early on that Midfield would bid on Mediterranean Grill.  (Rabell Dep. 67:1-12, Mar. 13, 2015, Doc. 46, Ex. F).

An underlying thread interwoven into Areas' representation of the facts of this case implicates a related but broader dispute: whether Midfield and Areas USA abandoned the Joint Venture and whether, consequently, the JV Agreement as a whole was no longer binding or effective.  It is undisputed that from an early point in the Joint

18

Venture, the parties chose not to operate concessions in the North Terminal jointly as envisioned by § 1.6 of the JV Agreement.  Instead, after bidding jointly, the parties would divide the awarded concessions equally based on projected sales and performance.  (Mashni Dep. 21:1–22:9).  Once the concessions were divided, Midfield and Areas USA operated them independently and kept their own profits and losses.  (Uribe Dep. 62:1-6).  The parties engaged in exactly one joint operation, Pasta Bravo, since the execution of the JV Agreement, but apart from that isolated instance they have operated separately and independently.  (Uribe Dep. 75:14-16).  According to Uribe, at the time of the McNamara RFP, Areas USA "didn't have a relationship with Midfield."  (Id. at 42:5-14).  He further testified that "[t]he relationship was really bad for many years . . . at some point really the companies were completely running independently.  It's like, you know, we weren't partners anymore."  (Id. at 35:1-17).  Mashni differed, stating that the relationship between Midfield and Areas USA was still ongoing at the time of the RFP, despite any prior disagreements.  (Mashni Dep. 81:5-22 ("Q. . . . [Y]ou basically knew the relationship was dead.  Is that fair?  A. It couldn't be dead because we have a relationship that's ongoing . . . [i]n this industry, nothing is dead.")).

According to Michigan law, "[t]he relationship of joint adventurers may not be changed, departed from, abandoned or dissolved without the mutual consent of all parties concerned."  Van Stee v. Ransford, 346 Mich. 116, 129 (Mich. 1956).  The evidence in the present case is insufficient to sustain a genuine question of fact regarding whether Midfield and Areas USA abandoned the Joint Venture.  Although Areas may have raised a question of fact as to its own understanding and intent to

19

dissolve the Joint Venture, it has not presented evidence demonstrating a similar understanding or intent on the part of Midfield.  Indeed, the undisputed facts largely point in the opposite direction – that Midfield very much wished to continue the Joint Venture.  For example, Midfield strenuously sought to discuss with Areas their respective capital contributions to the venture; the possibility of redistributing the concessions so as to operate on a more equal basis; and Areas USA's intentions to bid on the upcoming RFP.  Regardless of Areas' intentions, it has not produced evidence of a *mutual* consent to abandon the Joint Venture.  The Court therefore finds there to be no issue of fact and concludes as a matter of law that the JV Agreement was not dissolved or abandoned.

In conclusion, Areas USA falls short of proving by clear and unequivocal evidence that Midfield intentionally and voluntarily waived the Covenant Not to Compete, and this Court finds as a matter of law that Midfield did not waive the Covenant Not to Compete.

### c. Anticipatory Breach

Count II of Areas' Amended Counterclaim seeks a declaratory judgment that Midfield anticipatorily breached the Covenant Not to Compete.  Areas advances this theory both as a claim seeking damages and as a defense against liability for its own breach of contract.

An anticipatory breach or repudiation of contract occurs when a contracting party unequivocally declares, at a time prior to performance through its words or actions, that it will not perform.  Sargent v. City of Muskegon Heights, No. 175145, 1996 WL 33347922 at *2 (Mich. Ct. App. Dec. 6, 1996).  To determine whether or not a

repudiation occurred, the Court must look to the party's intentions as manifested by acts and words, not any clandestine motive that might be at play.  Stoddard v. Manufacturers Nat. Bank of Grand Rapids, 234 Mich. App. 140, 163 (1999).  With respect to repudiation by acts, "'a party's act must be both voluntary and affirmative, and must make it actually or apparently impossible for him to perform.'"  Paul v. Bogle, 193 Mich. App. 479, 494 (1992) (quoting Restatement (Second) of Contracts § 250 (1981)).  Under the doctrine of anticipatory breach, the innocent party has the option either to sue immediately for the breach of contract or to wait until the time of performance.  234 Mich. App. at 163.  It is a fundamental rule that a party may cease performance under a contract when the other party is in material anticipatory breach.  See Wigent v. Marrs, 130 Mich. 609, 611 (1902).

Areas first alleges that Midfield's unilateral bid on the chicken concept constitutes anticipatory breach.  Similar to its waiver defense, Areas again claims here that a dispute of fact exists as to whether Mashni informed Areas about Midfield's intent to bid on the chicken concept.  Consistent with the above findings, the Court accepts Mashni's uncontroverted testimony as evidence that he discussed the concept with Areas USA. (See Mashni Dep. 51:9-13).  Yet, even if the Court found that a dispute of fact existed, it is not material for the following reasons.  First, the Covenant Not to Compete does not expressly require a party to seek consent to submit a proposal or to object to the other party's submission of a proposal.  Therefore, assuming that Mashni did *not* contact Areas USA to discuss the chicken concept, there is still insufficient ground to find anticipatory breach.  Such conduct does not adequately signal an unequivocal declaration of an intent to breach in the future because, unless aware of the opposing

21

party's intention to bid, simply failing to notify the opposing party of bidding intentions does not violate the Covenant Not to Compete.

In essence, there is a major factual distinction regarding notice between Midfield's alleged anticipatory breach and Areas USA's breach. Areas' conduct constituted breach of contract because it had notice and reason to know of Midfield's intent to bid on the Mediterranean Grill, yet proceeded to bid anyway. Here, there is no evidence indicating that Midfield knew or should have known that Areas USA intended to bid on the chicken concept. Thus, notice of the opposing party's intention to bid implies a duty to disclose one's own intentions. Second, Areas USA could not succeed on a breach of contract claim with respect to the chicken concept because Areas USA did not bid on it. (Uribe Dep. 89:1-2). As such, Areas USA would be unable to sue for breach because of a lack of damages. Slomka, No. 298025, 2012 WL 4800421 at *3. Similarly, Midfield was not in breach by acting unilaterally because the Covenant provides that either party can "submit proposals . . . on their own if the other party does not wish to pursue said business opportunity." (Doc. 46, Ex. A at 15).

Apart from the chicken concept, Areas also claims that Midfield breached the Covenant Not to Compete by bidding against Areas USA for other packages during the McNamara RFP. (Doc. 30 at ¶ 14). Uribe reports that Midfield "won a lot of them." (Uribe Dep. 45:10-11). Areas USA asserts that Midfield "continued to seek concession opportunities without Areas USA's involvement or permission" as the basis for breach. (Doc. 53 at 15). Concerning "involvement," the parties again dispute whether Mashni truly informed Uribe of Midfield's intention to bid on the Mediterranean Grill, which the Court has already addressed. Despite there being no requirement in the JV Agreement

that a party actively notify the other of its intentions, Midfield at the very least notified Areas USA that it intended to bid on its current interests and properties.  (Mashni Dep. 73:11-15).  For Areas' part, Uribe never informed Mashni of Areas' intentions, even after Mashni inquired and requested that Uribe let him know at a later date.  (Mashni Dep. 64:6-24; 76:14-16; 74:10-14).  Additionally, there is no requirement that the parties pursue any particular business opportunity through the Joint Venture.  (Doc. 46, Ex. A at 15).  Consequently, Areas' alleged basis for Midfield's breach is inadequate given that no "involvement" between the parties is mandated in the Covenant Not to Compete.

In conclusion, Area USA has failed to show that Midfield at any time declared an unequivocal intention not to perform in accordance with the Covenant Not to Compete. The evidence Areas USA offers merely indicates that communication between the parties was lackluster at best, and even more so that Areas USA in particular was derelict in its communication.  The Court rules as a matter of law that Midfield did not anticipatorily breach the Covenant Not to Compete.  Therefore, Midfield is entitled to summary judgment on Count II of Areas' Amended Counterclaim.

### d.  Unreasonable Restraint on Trade

Lastly, Areas argues that the Covenant Not to Compete should be set aside because it is an unreasonable restraint on trade.  Michigan law does not favor noncompetition agreements.  United Rentals (N. Am.), Inc. v. Keizer, 202 F. Supp. 2d 727, 739 (W.D. Mich. 2002) aff'd, 355 F.3d 399 (6th Cir. 2004).  Michigan barred nearly all such agreements until passage of the 1985 Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771 et seq., which was amended in 1987 to permit reasonable employment noncompetition agreements:

23

> (1) An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its *duration*, *geographical area*, and the *type of employment or line of business*. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

Mich. Comp. Laws Ann. § 445.774a (emphasis added).

While the statute only explicitly addresses the employer-employee context, Michigan courts have held that noncompetition agreements other than those between employers and employees are subject to common-law rule of reason embodied within the Act.  See, e.g., Bristol Window & Door, Inc. v. Hoogenstyn, 250 Mich. App. 478, 497-98 (2002) ("We conclude that the trial court erred in construing §§ 2 and 4a of the MARA as a prohibition against all noncompetition agreements except those between employers and employees and in failing to apply the common-law rule of reason embodied within § 2 of the MARA.").  Ultimately, a covenant not to compete outside of the employer-employee context must protect a party's reasonable competitive business interests, and its protection must be reasonable with respect to: (i) duration; (ii) geographical scope; and (iii) the line of business restricted.  St. Clair Med., P.C. v. Borgiel, 270 Mich. App. 260, 266 (2006).  Additionally, the covenant must be reasonable as between the parties, and it must not be especially injurious to the public.  Id.

Assessing the reasonableness of a noncompetition agreement is inherently fact-specific; however, where the relevant facts are undisputed it becomes a question of law. Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 547 (6th Cir. 2007) (applying Michigan law).  Areas seeks declaratory judgment that the JV

24

Agreement's Covenant Not to Compete is unreasonable and therefore void.  Because Midfield does not seek declaratory judgment in its favor, all facts and reasonable inferences are drawn in a light most favorable to Midfield for purposes of this analysis. In order to prove that Covenant Not to Compete is an unreasonable restraint on trade, Areas need only demonstrate one of the following: (i) that Midfield is not protecting a legitimate business interest; (ii) that the duration of the Covenant is unreasonable; (iii) that the geographic scope of the Covenant is unreasonable; (iv) that the type of business restricted is unreasonable; or (v) that the Covenant is injurious to the public.

Midfield's business interest justifying the Covenant must be greater than merely preventing competition.  United Rentals, 202 F. Supp. 2d at 740.  Midfield asserts that, in conjunction with the Joint Venture, it was going to provide Areas USA with confidential and sensitive business information.  As such, Midfield insisted on the Covenant Not to Compete in part to prevent this information from being used by Areas to gain an unfair competitive advantage in future bidding opportunities.  (Doc. 54 at 23). Although Areas USA claims, "Midfield never imparted any confidential information to Areas USA with respect to [Midfield's prior interests,]" the Court must construe the evidence in the light most favorable to Midfield.  Under Michigan law, preventing the anticompetitive use of confidential information is a legitimate business interest.  See, e.g.,Whirlpool Corp. v. Burns, 457 F. Supp. 2d 806, 812 (W.D. Mich. 2006); Rooyakker & Sitz PLLC v. Plante & Moran, PLLC, 276 Mich. App 146 (2007).  Consequently, Areas USA fails to establish that Midfield lacks a legitimate business interest justifying the Covenant.

25

Michigan courts have not provided any bright line rules concerning what constitutes a reasonable duration for noncompetition agreements.  Certified Restoration, 511 F.3d at 547.  Instead, they have upheld such agreements ranging from six months to five years.  Whirlpool, 457 F. Supp. 2d at 813.  See also Rooyakker, 276 Mich. App. 146 (two years); St. Clair Med., 715 N.W. 2d at 917 (one year); In re Spradlin, 284 B.R. 830 (E.D. Mich. 2002) (five years).  Here, the Covenant Not to Compete applies for the duration of the Joint Venture itself:

> This Agreement shall be effective as of June 7, 2007.  The Joint Venture shall continue in existence until such time as the Joint Venture fails to be awarded the Concession or no longer has the right to operate the Concessions, unless sooner dissolved and terminated as specifically provided for in this Agreement.

(Doc. 46, Ex. A § 1.7).  Because the Covenant terminates when the Joint Venture ends, it is different from most noncompetition agreements that preclude competition *after* the relationship between parties ceases.  Consequently, case law addressing post-employment or business sales does not directly apply.  At the time the JV Agreement was executed in 2007, both Areas USA and Midfield knew that the McNamara Terminal concessions would be up for bid in approximately five or six years. A noncompetition agreement with any shorter a term would have been effectively useless in protecting Midfield's prior McNamara interests.  Given that the Covenant Not to Compete does not extend beyond the term of the Joint Venture, Areas USA has failed to show that its duration is unreasonable as a matter of law.

There is no real dispute over the geographic scope of the Covenant Not to Compete. The guiding principle in assessing geographic limitations is that the noncompetition agreement "must be tailored so that the scope of the agreement is no

26

greater than reasonably necessary to protect the employer's legitimate business interests." Certified Restoration, 511 F.3d at 547.  Here, the Covenant is reasonably limited in scope to the Detroit Metropolitan Airport.  Nor is there any assertion by Areas USA that the Covenant is in any manner injurious to the public.

Finally, whether the type of business restricted is reasonable also hinges primarily on the competitive business interests the non-compete is designed to protect. Id.  The Covenant here is limited to each party bidding against one another for food and beverage concessions at DTW.  It is not absolute because Areas USA or Midfield would be permitted to bid unilaterally if the other were not interested in bidding.  Areas points to Mashni's testimony that the Covenant precludes Areas from bidding on any of Midfield's prior interests, including the Mediterranean Grill, as evidence that the Covenant is unreasonable.  (Mashni Dep. 67:24–68:3).  Yet, the language of the Covenant does not support this interpretation.  When contractual terms are plain and unambiguous, the Court construes the language as written and presumes that the parties' intent is consistent with the ordinary meaning of the terms in the contract. United Rentals, 202 F. Supp. 2d at 735.  The Covenant does not preclude Areas USA from bidding on any of Midfield's prior interests under any circumstances, but only when Midfield also intends to bid on them.  Thus, this testimony referenced by Areas is irrelevant because the language of the Covenant does not impose the potentially unreasonable restriction on bidding that Mashni appears to believe exists.  The type of bidding restricted by the Covenant Not to Compete is not unreasonable as a matter of law.

In conclusion, Areas USA has failed to show as a matter of law that the Covenant Not to Compete is an unreasonable restraint on trade. As such, this Court rules that the Covenant Not to Compete is reasonable on its face as a matter of law.  Accordingly, as all of Areas' defenses to its breach of the Covenant Not to Compete have proven to be unsuccessful, Midfield is entitled to summary judgment on Count I of its Amended Complaint.

### B.  Breach of Fiduciary Duty

Both Midfield and Areas seek summary judgment on Midfield's Count IV breach of fiduciary duty claim.  "[I]t is hornbook law that a claimant cannot receive a double recovery for the same injury, even where alternate legal theories will support the same finding of liability."  Franklin Bank v. Tindall, No. 07-13748, 2008 U.S. Dist. LEXIS 86771 at *52 (6th Cir. Oct. 27, 2008) (quoting Scarff Bros., Inc. v. Bischer, Farms, Inc., 546 F. Supp. 2d 473, 487 (E.D. Mich. 2008)).  In the present case, Midfield conceded at oral argument that it advanced its breach of fiduciary duty claim in the alternative to its breach of contract claim, as the two claims seek recovery for the same injury. Accordingly, Areas is entitled to summary judgment on this claim.

### C.  Interference With Business Relations

Both Midfield and Samir Mashni seek summary judgment on Areas' Count III counterclaim for tortious interference with business relations.  In order to prevail under Michigan law on a claim for tortious interference with a business expectancy, a plaintiff must establish the following elements: (i) the existence of a valid business relationship or expectancy; (ii) knowledge of the relationship or expectancy on the part of the defendant; (iii) intentional interference causing or inducing a termination of the

relationship or expectancy; and (iv) resultant actual damage.  Saab Auto. AB v. GM Co., 770 F.3d 436, 440 (6th Cir. 2014) (citing Cedroni Assocs. v. Tomblinson, Harburn Assocs., Architects & Planners, Inc., 492 Mich. 40, 45 (2012)).  Areas identifies two groups of disparaging statements allegedly made by Mashni in 2009 and 2012 in its Supplemental Answer to Mashni's interrogatories:

1.  That "you guys are bad operators," that "I have to pick up your pieces," and that "I'm better and you are not that good."

2.  That "you have the guts to come here," "you should not be here, you haven't turned in your audit information."

(Doc. 46, Ex. H at 2-3).  Areas claims that "Mashni's statements and conduct damaged Areas USA's reputation in the industry and interfered with its ability to secure, directly or indirectly, airport concessions." (Id. at 3).  Specifically, Areas alleges that it won a single concession bid at DTW in 2014, while Midfield won three.  (Doc. 52, p. 8).

### i. Statute of Limitations

The statute of limitations applicable to a claim for tortious interference action is three years.  James v. Logee, 150 Mich. App. 35, 38 (Mich. Ct. App. 1986).  Because some of Mashni's statements were allegedly made in 2009, Midfield argues that these statements are no longer actionable, as they fall outside the limitations period. "Limitations periods in tort actions begin to run at the time all elements, including damages, can be alleged in a proper complaint."  Blazer Foods, Inc. v. Restaurant Props., Inc., 259 Mich. App. 241, 254 (Mich. Ct. App. 2003).  Relying on this principle, Areas contends that to the extent that the claim is premised on the statements made in 2009, it remains timely because Areas did not incur economic damages until 2014. Midfield's only argument in rebuttal is that the "discovery rule" (viz., that the limitations

period does not begin to run until such time as the plaintiff discovers or should have discovered damages) does not apply to a tortious interference claim. See Bliss Clearing Niagara, Inc. v. Midwest Brake Pond Co., 270 F. Supp. 2d 943, 954 (W.D. Mich. 2003).

Areas, however, does not argue for the application of tolling pursuant to the discovery rule; rather, it argues that its claim did not accrue until it suffered injury. The applicable accrual statute indicates that "the limitations period runs from the time the claim accrues . . . . [and] the claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results." Mich. Comp. Laws § 600.5827. The purpose of this provision is to prevent subsequent damage from extending the period of limitations. Am. States Ins. Co. v. Taubman, 352 F. Supp. 197, 200 (E.D. Mich. 1972). Case law has clarified that a "wrong" occurs at the time at which a plaintiff is initially harmed by a defendant's act, not necessarily the date on which the defendant acted. Schaendorf v. Consumers Energy Co., 275 Mich App. 507, 512 (Mich. Ct. App. 2007). Here, the initial damage occurred when Areas' reputation was allegedly damaged; although Areas measures damages from the date at which it lost the bids, the lost business opportunities are merely subsequent damages. Indeed, Areas separately seeks exemplary damages for damage to its reputation. However, even if the statements Mashni made in 2009 are precluded from consideration under the statute of limitations, the statements he made in 2012 are not. Therefore, the statute of limitations does not entirely bar the tortious interference claim.

### ii. Business Expectancy

An intentional interference claim requires a showing, with some degree of specificity, of a valid business expectancy reflecting "a realistic expectation and not merely wishful thinking." Schipani v. Ford Motor Co., 102 Mich App. 606, 622 (Mich. Ct. App. 1981), *overruled on other grounds*, Ferrett v. Gen. Motors Corp., 438 Mich. 235, 239-40 (1991). "Plaintiff need not prove the existence of an enforceable contract; it is sufficient to show interference with specific third parties or an identifiable prospective class of third persons with whom plaintiff had a reasonable expectation of contracting." Hoffman v. Roberto, 85 B.R. 406, 416 (W.D. Mich. 1987) (citing Schipani, 102 Mich. App. at 621-22)).

Areas has alleged a business expectancy with the DTW Airport Authority with respect to the bids awarded in 2014. Given the undisputed fact that Areas had transacted business with and operated concessions at DTW previously, its business expectancy was also reasonable. It has therefore sufficiently identified a specific third party with whom it had a reasonable expectation of contracting. Indeed, in Hoffman, the court found that the plaintiff's mere identification of trucking firms as a class of third persons with whom he had a reasonable expectation of being hired to sufficiently allege a valid business expectancy. See 85 B.R. at 417.

### iii. Intentional and Improper Interference

A claim for tortious interference will succeed only if the plaintiff can show that the defendant intentionally or maliciously sought to interfere in a business relationship. Knight Enters. v. RP Oil Co., 299 Mich. App. 275, 280-82 (Mich. Ct. App. 2013). "To prove his claim, 'the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference.'" Modin v. W.

31

Branch Reg'l Med. Ctr., No. 320452, 2015 Mich. App. LEXIS 1137 at *9-10 (Mich. Ct.
App. June 2, 2015) (quoting BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.,
217 Mich. App. 687, 699 (Mich. Ct. App. 1996)).

First, Midfield questions whether Mashni actually made such derogatory
comments about Areas to the DTW Airport Authority.  According to Uribe's deposition,
he learned of Mashni's alleged statements from two Areas USA employees, Valentina
Ellison and Huy Phan.  (Uribe Dep. 114:25).  Further, Uribe testified that Ellison and
Phan informed him of a rumor circulating that Mashni vindictively intended to ensure
that Areas won no concessions.  (Id. at 114:13-25).  Meanwhile, Mashni stated during
deposition that he made no such threats against Uribe or any other Areas employee.
(Mashni Dep. 84:9-22 ("Absolutely not.  I don't have any authority to even begin that
kind of a – any kind of discussion like that, no.")).  When asked whether he made any
statements to Airport Authority representatives regarding his impressions of the manner
in which Areas conducts business, Mashni stated that he did not know.  (Id. at 85:2-4).
Although Midfield appears to suggest that Uribe's testimony regarding Ellison's and
Phan's information is inadmissible hearsay, Ellison and Phan are available to testify to
Mashni's statements.  Given the conflicting testimony, the Court cannot determine as a
matter of law that these statements did not occur or that they were not made with the
malicious intent of interfering with Areas' business relations within the airport.

Second, Midfield argues that even if Mashni made the alleged statements, they
amount to nothing more than opinions, which are protected against suit for tortious
interference.  See Lakeshore Comm. Hosp., Inc. v. Perry, 212 Mich. App. 396, 401-02
(Mich. Ct. App. 1995) ("[W]here the conduct allegedly causing the business interference

32

is a defendant's utterance of negative statements concerning a plaintiff, privileged speech is a defense."). Areas, however, maintains that Lakeshore authorizes dismissal of tortious interference claims only where a defendant successfully offers the defense of protected speech against allegations of defamation. See Hoffman, 85 B.R. at 415 ("[E]ven if plaintiff can not [sic] establish the defamatory content of either telex, plaintiff may be able to establish that defendants committed an otherwise legal act for the purpose of interfering with his future employment prospects."). Since Areas has not alleged a defamation claim against Mashni, Areas contends that the defense of protected speech is inapplicable. Upon reviewing Lakeshore, the Court notes that it is not clearly premised on a finding of defamation, as the complaint alleged claims for breach of a merger agreement and termination of a business relationship by improper means or wrongful conduct. 212 Mich. App. at 400. Although the decision notes that tortious interference may be caused by defamatory statements, there were no findings of fact regarding whether defamation had occurred. See id. at 401. No other cases, however, have relied on Lakeshore for the more general principle that protected speech is a defense against tortious interference absent a separate claim for defamation. Given the rather unclear support for Midfield's position, the Court declines to dismiss the claim on this basis.

### iv.   Damages and Causation

Midfield next contends that Areas has failed to show actual damages. To the contrary, Areas has alleged damages in the form of loss of reputation and loss of business opportunities at the airport during the 2014 bidding. A corporation "may obtain exemplary damages for non-pecuniary injuries that are incapable of precise calculation,"

33

such as loss of reputation or good will.  JP Morgan Chase Bank, NA v. Jackson GR, Inc., No. 311650, 2014 Mich. App. LEXIS 1297 at *22 (Mich. Ct. App. July 15, 2014) (citing Unibar Maint. Servs., Inc. v. Saigh, 283 Mich. App. 609, 631 (Mich. Ct. App. 2009)).  In order to successfully assert a claim for exemplary damages, the plaintiff must show that the injuries were maliciously, willfully, and wantonly inflicted.  Id. at *22-23. Consistent with the discussion and evidence set forth above, the Court cannot conclude that Mashni's statements were not made with the malicious intent to interfere with Areas USA's business relations.  Accordingly, though Areas admittedly has not quantified its actual damages, it has presented sufficient evidence demonstrating that they exist.

Finally, Midfield challenges Areas' ability to demonstrate that Mashni's alleged statements proximately caused either a loss of reputation or loss of business opportunities.  The deposition evidence supports this argument.  During deposition, Uribe admitted (i) that Mashni lacked the authority to influence the Airport Authority not to contract with Areas; (ii) that he could not say with any degree of certainty whether Areas had lost any business due to Mashni's statements; and (iii) that he had no knowledge as to whether the persons responsible for making the decision had heard anything from Mashni:

> Q. Now you've known Samir for a number of years.  Do you think he has the authority and power to preclude Areas USA from getting business at the airport?
> A. The authority and the power, no.  He doesn't have the authority and power.
>
> . . . .
>
> Q. Has Areas lost any business at the airport because of what Mashni said?
>
> [Objections omitted]

2:14-cv-12174-MOB-RSW   Doc # 60   Filed 09/17/15   Pg 35 of 45   Pg ID 1923

> A. Difficult to say. If he did say those things – well, we didn't win some things. It's difficult to say if we win something. If all the rumors were true, if we would have won something, who knows.
>
> Q. But you don't have any knowledge about whether the persons that decided on making the awards and procurement had heard anything from Mr. Mashni?
>
> A. No, I don't have any knowledge of anything of that nature.
>
> Q. Do you have any other opinions as to how Mr. Mashni's statement may have damaged Areas USA?
>
> A. No.

(Uribe Dep. 115:20-116:22). Although Areas implies that Mashni's reputation conferred a degree of influence with the Airport Authority, the deposition testimony cited for that proposition supports only the inference that Mashni was a desirable partner because he had experience and was known within the Detroit market. (See Mashni Dep. 28:4-7; Rabell Dep. 15:17-19, 70:2-6). Indeed, Mashni confirmed that he lacked the authority to prevent or impede Areas from transacting business at the airport. (Mashni Dep. 84:16-22).

As noted by Midfield, Areas offers no declarations or affidavits from any of the DTW officials who allegedly overheard Mashni's derogatory statements or from any person in a position of authority with respect to awarding the bids. Rather, Areas relies on the alleged rumors that Mashni vindictively sought to prevent Areas USA from successfully bidding. Areas maintains that the airport concessionary business is a small industry and that negative gossip could result in a foreseeable detriment to a competitor. (Uribe Dep. 115:15-17). At the summary judgment stage, however, it is Areas' burden to come forward with circumstantial evidence permitting a reasonable inference of causation with at least some basis in established fact. See Skinner v. Square D Co., 445 Mich. 153, 164 (1994). It is insufficient to "submit a causation theory that, while factually supported, is, at best, just as possible as another theory." Id.

35

Areas' attempts to differentiate the present case from Skinner are ultimately unpersuasive.  The plaintiffs in Skinner presented virtually no evidence to support their position, as it centered on an "unwitnessed mishap," while Areas maintains that it has provided compelling circumstantial evidence.  See id. at 163.  Although Areas has presented more evidence than was available in Skinner, the evidence is merely attenuated speculation that is insufficient to meet Areas' burden of showing that it would have been awarded any project, concession, or opportunity from the airport absent Mashni's alleged tortious interference.  Accordingly, the Court grants summary judgment on Areas' claim for tortious interference in favor of Midfield and Mashni.

### A. Misappropriation of Trade Secrets & Confidential Information

In Count II of its Amended Complaint, Midfield advances a claim under the Michigan Uniform Trade Secrets Act ("MUTSA"), alleging that Areas USA obtained and misappropriated Midfield's trade secrets and valuable confidential information through the 2007 Joint Venture.  (Doc. 25 ¶ 37).  MUTSA defines a "trade secret" as information that "[d]erives independent economic value, actual or potential, from not being generally known" and is the subject of reasonable efforts to maintain its secrecy.  Mich. Comp. Laws § 445.1902(d).  Meanwhile, "misappropriation" entails the use of a trade secret without consent by a person who "acquired it under circumstances giving rise to a duty to maintain its secrecy or limit its use."  Mich. Comp. Laws § 445.1902(b).  "To sustain a claim under MUTSA, it is incumbent on the plaintiff to identify with specificity the 'trade secret' allegedly misappropriated."  Indus. Control Repair, Inc. v. McBroom Elec. Co., Inc., No. 302240, 2013 Mich. App. LEXIS 1581 at *18 (Mich. Ct. App. Oct. 10, 2013).

36

In identifying what information it claims was misappropriated, Midfield makes broad reference to "business processes" and various unidentified documents. With respect to these generic business processes, Midfield has failed to carry its burden of producing documentary evidence supporting its claim at the summary judgment stage. See id. The only documents identified with any level of specificity are profit and loss margin statements related to Midfield's operation of the Mediterranean Grill. Michigan courts have deemed sales, profitability, and pricing data to be trade secrets protected under MUTSA. See Kelly Servs. v. Eidnes, 530 F. Supp. 2d 940, 951-52 (E.D. Mich. 2008); Kelly Servs. v. Noretto, 495 F. Supp. 2d 645, 657 (E.D. Mich. 2007).

Even though Midfield has shown that its profit and loss margins are protectable trade secrets, it is unable to demonstrate that this information was actually misappropriated. Midfield accuses Areas USA of using this information to form Areas McNamara's bid for Package #6. Assuming that Areas had access to this information, there is no tangible indication that Areas used it when formulating its bid. In support of its claim, Midfield relies on Mashni's testimony that "[Areas USA] had our [Profit and Loss Statements]. They knew everything that we did financially." (Mashni Dep. 106:10-14). According to Mashni, Midfield initially provided this information to Areas USA to form the Joint Venture's bids for the North Terminal. (Id. at 107:15-16). Yet, Mashni later testified that he had no concrete reason to believe that Areas USA misused Midfield's profit and loss statements: "Q. Do you know that [Areas McNamara] used your [Profit] and [Loss] information, or is that just speculation on your part? A. No, I don't know for a fact." (Id. at 128:23-25).

In contrast, Eduardo Uribe, who prepared the bid on Package #6, directly contradicts Mashni's assertions: "The only thing I had was [Midfield's] sales. It was public information. Q. Did you have profit and loss statements from Midfield? A. I did not." (Uribe Dep. 102: 17-21). In fact, Uribe himself formulated Areas McNamara's bid for Package #6 and provided a detailed rationale describing how the bid was developed, without any reference to or reliance on Midfield's profit and loss statements:

> Q.   Upon what do you base or did you base those numbers?
> A.   Well, everything changes. Depends on the line on the P&L. Sales are based on – we based that on the placement, the traffic, traffic in the area, sales of existing locations, which is public information and actually part of the bid. And then the rest we generate from internally. I work with – we have a group of concepts and standards which is called, which is like six people that we work with menus. We develop recipes. We create theoretical cost of goods. We work with the brand, in this case Meza Mediterranean Grill and the menu. Based on the member, we talk recipes, purchases, et cetera. That's how we determine the cost of goods. The operating expenses is based on experience. We operate there and we operate in 10 airports. So we know what concession fees we propose. Salaries and wages, we develop charts for how many employees we need, when, what time. We operate, like I said, many restaurants around the country, around the world. So we know – we know how – we've been doing it for 40 something years.

(Id. at 101:8-102:5.) Additionally, he testified that he did not have access to or use Midfield's profit and loss margins beyond the publicly available sales data. (Id. at 102:13-24.) This evidence is sufficient to support Areas' motion for summary judgment on the misappropriation claim and shift the burden to Midfield. See McBroom, 2013 Mich. App. LEXIS 1581 at *19. Midfield has failed to come forward with any evidence rebutting Areas' position. Accordingly, the Court grants summary judgment on Midfield's Count II MUTSA claim in favor of Areas.

### B.  Breach of Contract – Capital Contributions

Count III of the Amended Complaint sets forth a claim for breach of contract based on Areas USA's alleged breach of § 2.1 of the JV Agreement setting forth the parties' respective capital contributions and capital interests.  Section 2.1 of the JV Agreement stipulates:

> CAPITAL CONTRIBUTIONS; CAPITAL INTERESTS. Each Member shall make the following contributions of property to the Joint Venture on or before March 15, 2007, herein referred to as "Interest" or Capital Interest".
>
> AREAS USA, INC.: $ 510.00 being a 51% contributor of Capital Contributions.
>
> MIDFIELD CONCESSIONS ENTERPRISES, Inc: $ 490.00 being a 49% contributor of Capital Contributions.

(Doc. 46, Ex. A at 2).  Relatedly, § 6.2 of the JV Agreement states, "each Member shall share in the Profits and Losses of the Joint Venture in proportion to their respective Capital Interests.  (Id. at 9).

Midfield alleges that it became apparent sometime in 2009 or 2010 that the parties were not operating on an equal basis as envisioned.  Instead of splitting the costs equally, Midfield covered approximately 60%, while Areas USA contributed approximately 40%.  (Mashni Dep. 25:8-14).  Although Mashni attempted to address the disparity with Uribe and Rabell throughout 2011 and 2012, he never received any meaningful response.  (See Doc. 54, Ex. H).  Uribe confirmed that Mashni contacted him about this several times and stated that Areas USA never responded "[b]ecause we didn't agree on things. Because probably it was – [the Joint Venture] was a bad project for everyone . . . We all lost a lot of money."  (Uribe Dep. 32:15–33:2). Midfield now asserts that it is entitled to damages in excess of $25,000 to reconcile the imbalance in capital contributions.  Meanwhile, Areas contends that from the outset, the parties

simply split up the restaurant concepts on an ad hoc basis, operated them independently, and reaped the profits of their respective restaurants without respect to the terms of § 6.2 of the JV Agreement.  Accordingly, Areas argues that their course of performance controls over any express contractual language.

Midfield objects to several capital expenditures in particular.  First, it contends that in order for the Joint Venture to maintain its concession agreement with the DTW Airport Authority, it must pay a Minimum Annual Guaranty ("MAG").  As of January 2011, Midfield states that it was paying approximately 60% of the MAG, while Areas USA paid approximately 40%.  Midfield claims to have therefore paid approximately $860,000 more in MAG fees than Areas USA.   Second, Midfield states that it was responsible for 58% of sales of the joint venture, with Areas USA contributing only 42%.  Third, Midfield contends it secured rent relief from the Airport Authority on a concession operated entirely by Areas USA, thereby conferring a benefit on Areas.  Because passenger traffic at the new North Terminal failed to meet expectations, the DTW Airport Authority decreased the monthly rent payments for two concessions: Pasta Bravo and Le Boulanger, the latter of which Areas USA operated exclusively.  Although Midfield and Areas USA split the rent savings from Pasta Bravo equally, only Areas USA benefited from the rental relief for Le Boulanger.  (Doc. 54, Ex. I at 1).  Lastly, Midfield notes a disparity between the annual amount of rent spent by it and by Areas.

The express terms of the JV Agreement are silent as to whether the relatively equal capital contributions set forth in § 2.1 were to be maintained throughout the course of the joint venture; accordingly, parol evidence of the parties' intent is relevant.  See Klapp v. United Ins. Group Agency, Inc., 468 Mich. 459, 471 (Mich. 2003) (finding

40

that where the contractual language is ambiguous, relevant extrinsic evidence of the parties' intent may be considered). Depositions confirm that the parties' intent at the execution of the agreement was that Midfield and Areas would both make contributions and share in the profits equally and on an ongoing basis. (Mashni Dep. 24:5-14; Uribe Dep. 29:24-30:5; Rabell Dep. 21:7-9). Midfield and Areas USA initially divided the concessions equally based on projected net profits and anticipated investment – nonetheless, the parties would operate their respective concessions relatively independently of each other. (See Mashni Dep. 21:1-22:1, 26:2-28:20; Uribe Dep. 29:24-30:9, 35:18-36:9). However, several of the concessions assigned to Areas were put on hold due to passenger traffic being less than anticipated in the North Terminal. (Mashni Dep. 26:17-27:11; Uribe Dep. 32:15-33:2). During deposition, Uribe testified that the joint venture was ultimately a bad deal on which Areas USA lost money, and that no discussions to terminate the JV Agreement were necessary or relevant because each company was operating its concessions independently. (Uribe Dep. 35:11-17). Mashni testified that there was an "understanding" between Midfield and Areas USA that if the parties ended up having disparate costs, sales and net profits then they would try and make things equal. (Mashni Dep. 29:4-16). However, the parties never reduced this understanding to writing. (Id. at 22:10-15). Likewise, although Mashni frequently expressed his frustration to Uribe regarding the disparity in capital contributions, no agreement or compromise was ever reached between the parties.

In asserting its claims, Midfield appears not to take into account the fact that it was operating more concessions within the North Terminal than Areas USA, since several of the restaurant concepts assigned to Areas USA were either abandoned or

put on hold.  Although Midfield generated greater net revenue than Areas USA, it collected the profits itself – that is, there is no indication that it shared its profits with Areas USA.  Moreover, although it invested a greater amount of capital in rent and other expenditures, it also reaped the payoff of its investments in the form of greater sales than Areas.  Accordingly, the parties appear to have abided by the terms of § 6.2 of the agreement, which specified that they would share in the profits in proportion to their respective investments or capital contributions.  Although Mashni testified that he discussed with Uribe the possibility of "reshuffling" the restaurants in order to operate the partnership on a more even scale, no such agreement was ever executed.  (Id. at 32:13-25.)  Accordingly, to the extent that Midfield alleges a discrepancy in sales to be a breach, it cannot show that it has suffered any damages.

The issue of rent relief is not clearly a breach of any contractual provision.  The JV Agreement generally sets forth the extent of the parties' rights and obligations with respect to the joint venture and to each other.  The agreement is silent on the issue of one party's obligation to reimburse another party for negotiated cost savings.  Indeed, it would appear that Midfield independently elected to obtain and confer this benefit.  Accordingly, there was no negotiation between the parties requiring Areas USA to reimburse Midfield for its efforts.  Consequently, there has been no breach of the JV Agreement.  Even if there had been a breach, Midfield has not alleged in what way it was damaged by conferring such a benefit.

With respect to the MAG, it would appear that Midfield and Areas were contributing in approximately the same proportions at which they were generating sales.  However, because these fees were a general cost of operating the joint venture, the

42

parties most likely intended to share the responsibility equally.  Areas USA offers no rebuttal to this issue.  Therefore, the Court finds that Areas USA is not entitled to summary judgment on the breach of contract claim with respect to the MAG costs only.  The Court, however, does find that Areas USA is entitled to summary judgment with respect to the other disparities in capital contributions addressed.

### C. Unjust Enrichment

Counts V and VI of Midfield's Amended Complaint advance claims for unjust enrichment.  More specifically, Count V alleges that Areas USA was unjustly enriched to the extent that it benefitted from the rent relief deal discussed above.  Meanwhile, Count VI alleges that Areas McNamara was unjustly enriched to the extent that it benefitted from its misappropriation of Midfield's confidential financial information.

In order to succeed on a claim of unjust enrichment, a plaintiff must establish (1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant.  Belle Isle Grill Corp. v. City of Detroit, 256 Mich. App. 463, 478 (Mich. Ct. App. 2003).  Unjust enrichment is an equitable claim in which a court will imply a contract to avoid inequitable results; however, "a contract will be implied only if there is no express contract covering the same subject matter."  Id.  As discussed above, the JV Agreement covers the relationship, rights, and obligations between Midfield and Areas.  However, even if the claim were addressed under an unjust enrichment analysis, Midfield would not succeed.  The facts do not present an inequitable situation because Areas USA did not act wrongfully in obtaining the rent relief.  Midfield voluntarily undertook to obtain the rent relief without any insistence on the part of Areas USA.  Further, Midfield does not

appear to have incurred any costs or damages in obtaining the relief and, in fact, also benefitted from the rent relief for the Pasta Bravo concession. The Court therefore concludes that Areas USA is entitled to summary judgment on Count V.

Additionally, because Midfield cannot succeed on its misappropriation claim, as determined above, Areas McNamara is entitled to summary judgment on Count VI.

## IV. CONCLUSION

For the foregoing reasons, the Court should **GRANT IN PART AND DENY IN PART** Midfield's Motion for Partial Summary Judgment, **GRANT IN PART AND DENY IN PART** Areas' Motion for Partial Summary Judgment, and **GRANT** Samir Mashni's Motion for Summary Judgment. More specifically, with respect to Midfield's motion, the Court grants summary judgment in its favor on the following claims: Midfield's claim for breach of the Covenant Not to Compete (Count I of the Amended Complaint); Areas' claim seeking a declaration that the Covenant Not to Compete was waived (Count I of Amended Counterclaim); Areas' anticipatory breach claim (Count II of Amended Counterclaim); and Areas' tortious interference with business relations claim (Count III of Amended Counterclaim). The Court, however, denies Midfield's motion for summary judgment with respect to Midfield's breach of fiduciary duty claim (Count IV of the Amended Complaint). With respect to Areas' motion, the Court grants summary judgment in its favor on the following claims: Midfield's misappropriation and unjust enrichment claim (Count II of Amended Complaint); Midfield's breach of contract for capital contributions claim, to the extent discussed herein (Count III of Amended Complaint); Midfield's breach of fiduciary duty claim (Count IV of Amended Complaint); and both of Midfield's unjust enrichment claims (Counts V and VI of Amended

44

Complaint).  However, the Court denies Areas' motion for summary judgment as to

Midfield's Breach of the Covenant Not to Compete (Count I of Amended Complaint) and

breach of contract for capital contributions with respect to the MAG fees.  Finally,

Mashni is hereby **DISMISSED** from the action.

      **IT IS SO ORDERED.**

Date:      September 17, 2015                 s/Marianne O. Battani_____

                                              MARIANNE O. BATTANI

                                              United States District Judge

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 17, 2015.

                                        s/ Kay Doaks_____

                                        Case Manager